1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TROUT UNLIMITED, NATIONAL WILDLIFE
FEDERATION, OREGON NATURAL
RESOURCES COUNCIL FUND, PACIFIC
COAST FEDERATION OF FISHERMEN'S
ASSOCIATIONS, and INSTITUTE FOR
FISHERIES RESOURCES,

                 Plaintiffs,

      v.

D. ROBERT LOHN, in his official capacity as
Regional Administrator of the National Oceanic &
Atmospheric Administration Fisheries Service's
Northwest Region, and NATIONAL MARINE
FISHERIES SERVICE,

                 Defendants.

CASE NO. C05-1128C

ORDER

I.      INTRODUCTION

      This matter has come before the Court on the Federal Defendants' motion to dismiss (Dkt. No.

18). Having carefully considered the papers filed by the parties in support of and in opposition to the

motion, the Court has determined that no oral argument shall be necessary. For the reasons that follow,

the motion to dismiss is DENIED.

ORDER – 1

1    II.    BACKGROUND

2        Plaintiffs brought this action to challenge the National Marine Fisheries Service's ("NMFS")

3    promulgation of its Policy on the Consideration of Hatchery-Origin Fish in Endangered Species Act

4    Listing Determinations for Pacific Salmon and Steelhead ("Hatchery Listing Policy" and "HLP"), 70 Fed.

5    Red. 37, 204 (June 28, 2005) (to be codified at 50 C.F.R. pts. 223 & 224).

6        The HLP was formulated in response to a court ruling "invalidat[ing] the practice described in the

7    Interim Policy of generally excluding hatchery stocks that . . . were part of the same 'distinct population

8    segment' (DPS) as the listed natural populations." Hatchery Listing Policy, 70 Fed. Reg. at 37,205.

9    Under the new HLP, "hatchery stocks determined to be part of a DPS will be considered in determining

10   whether a DPS is threatened or endangered under the ESA, and will be included in any listing of the

11   DPS." *Id.* The HLP goes on to set forth a five-step process for the NMFS to follow in making listing

12   determinations for "evolutionarily significant units" ("ESU") of Pacific salmon and steelhead.

13       The first step is to recognize that a DPS of "a Pacific salmon or steelhead species is considered

14   for listing if it meets two criteria: (a) it must be substantially reproductively isolated from other

15   conspecific population units; and (b) it must represent an important component in the evolutionary legacy

16   of the species." *Id.* at 37,215. The second step specifies:

17           In delineating an ESU to be considered for listing, NMFS will identify all components of
             the ESU, including populations of natural fish and hatchery stocks that are part of the
18           ESU. Hatchery stocks with a level of genetic divergence relative to the local natural
             populations(s) that is no more that what occurs within the ESU: (a) are considered part of
19           the ESU; (b) will be considered in determining whether an ESU should be listed under the
             ESA; and (c) will be included in any listing of the ESU.
20
21   *Id.* The third step emphasizes, in contrast to the previous Interim Policy, that "[s]tatus determinations for

22   Pacific salmon and steelhead ESUs will be based on the status of the *entire* ESU." *Id.* (emphasis added).

23   The fourth step explains that status determinations "generally consider four key attributes: abundance;

24   productivity; genetic diversity; and spatial distribution," and that inclusion of hatchery fish in an ESU,

25   when appropriate under the second step, can either positively or negatively affect the overall status of the

26   ORDER – 2

ESU. *Id.* The final step provides that "[f]or ESUS listed as threatened, NMFS will, where appropriate, exercise its authority under section 4(d) of the ESA to allow the harvest of listed hatchery fish that are surplus to the conservation and recovery needs of the ESU, in accordance with approved harvest plans." *Id.* at 37,215–16.

Plaintiffs' challenge to the HLP is based on two claims: (1) the allegation that the Federal Defendants failed to prepare an environmental impact statement or environmental assessment with respect to the HLP, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332; and (2) the allegation that the HLP runs counter to the best science mandate of the Endangered Species Act ("ESA").  Plaintiffs's claims are presented to this Court pursuant to the Administrative Procedure Act ("APA", 5 U.S.C. § 551 *et seq.*

III.   ANALYSIS

   A.   *Applicable standard*

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that an action will be dismissed for failure to state a claim upon which relief may be granted.  A court will grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  While a court must accept all material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party, conclusory allegations of law or unwarranted inferences of fact urged by the nonmoving party are insufficient to defeat a motion to dismiss.  *Ove v. Gwinn*, 264 F.3d 817, 821 (9th Cir. 2001).  In addition, a court's obligation to construe allegations in the light most favorable to the nonmoving party does not mean that those allegations must be construed in a light favorable to the nonmoving party, if such a construction cannot reasonably be made.

Here, the Federal Defendants argue that although the APA authorizes judicial review of a "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, Plaintiffs have failed to state a claim because the Hatchery Listing Policy is not a "final agency action."

ORDER – 3

1       **B.**  *Is the Hatchery Listing Policy a "final agency action"?*

2       Plaintiffs bring this action under the general review provisions of the APA, 5 U.S.C. § 704, as

3    opposed to pursuant to specific authorization in the substantive statute.  Section 704's general review

4    provision authorizes judicial review of a "final agency action."  Thus, the aggrieved party must identify an

5    "agency action," and that action must be "final."

6       **1.**  *"Agency action"*

7       "Agency action" is defined in § 551, *see id.* § 701 (specifying that for the purposes of chapter 7,

8    governing judicial review, "agency action" is as defined in § 551), as including "the whole or a part of an

9    agency rule, order, license, sanction, relief, or the denial thereof, or failure to act."  "Rule" means "the

10    whole or a part of an agency statement of general or particular applicability and future effect designed to

11    implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice

12    requirements of an agency."  *Id.*  One of the questions before the Court is whether the challenged HLP

13    constitutes a "rule", thus qualifying as an "agency action".  The Court concludes that it does.

14       "When interpreting a statute, '[o]ur task is to construe what Congress has enacted.'"  *Carson*

15    *Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (quoting *Duncan v. Walker*, 533

16    U.S. 167, 172 (2001)).  The Court must begin with the language of the statute.  *Id.*  "It is elementary that

17    the meaning of a statute must, in the first instance, be sought in the language in which the act is framed."

18    *Id.* (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).   "When there is no indication that

19    Congress intended a specific legal meaning for [a] term, the court may look to such sources as

20    dictionaries for a definition."  *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999).

21       Section 551's definition of "rule" includes a great many types of "statements".  Of the statements

22    included in § 551 are those such as the HLP, which is an agency statement of future effect which

23    prescribes a policy and which also describes an agency procedure.

24       As a preliminary matter, the HLP clearly concerns "policy".  It is titled, in relevant part, "Policy

25    on the Consideration of Hatchery-Origin Fish."  It references itself repeatedly as a "policy."  *See, e.g.*,

26    ORDER – 4

HLP, 70 Fed. Reg. at 37,215 (stating that "[t]his Policy . . . is a general statement of policy," "[the] NMFS adopts the following policy . . .," " "[t]his policy provides direction," etc.). The Federal Defendants themselves concede that the HLP is a statement of policy. Finally, the HLP, as a document setting forth criteria and providing direction, fits the dictionary definition of "policy", a term left undefined by the statute. According to the dictionary, "policy" means "[a plan or course of action . . . intended to influence and determine decisions, actions, and other matters," or "[a] course of action, guiding principle, or procedure considered expedient, prudent, or advantageous." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1358 (4th ed. 2000).

In addition, the HLP "prescribes" the policy therein within the meaning of § 551. "Prescribe" is not defined by the statute. However, its dictionary definition is "[t]o set down as a rule or guide" or "[t]o establish rules, laws or directions." *Id.* at 1387. The HLP repeatedly states that "[t]his policy provides direction," and "establishes criteria for including hatchery stocks." *See, e.g.*, HLP, 70 Fed. Reg. at 37,215 (section titled "Policy Purpose"). Thus, the Court finds that the HLP "prescribes policy" within the meaning of § 551's definition of "rule."

The HLP could also be understood to describe an agency procedure, namely the procedure by which the NMFS will consider hatchery fish when making ESA listing determinations regarding ESUs of Pacific salmon and steelhead.

For these reasons, the Court finds that the HLP is a "rule," and is thus an "agency action" within the meaning of §§ 551 and 701.[1]

---

[1]To the extent that the Federal Defendants argue that the HLP is a "general statement of policy" as opposed to a "substantive rule," this distinction is inapposite to the consideration of whether a statement of policy is a "rule"— unqualified by the adjective "substantive"—within the meaning of § 551 and constituting "agency action." The distinction between a "general statement of policy" and "substantive rule" is primarily employed in considering whether a particular rule is subject to the APA's notice and comment requirements as set forth in 5 U.S.C. § 553(b)–(c). *See, e.g.*, *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011–1017 (9th Cir. 1987) (performing the analysis of whether a directive qualifies as a "general statement of policy" within the meaning of § 553's exception to the notice and comment requirements).

ORDER – 5

1              2.      *"Final"*

2          An action is considered a "final agency action" if it (1) marks the "consummation" of the agency's

3  decisionmaking process", and (2) is one which determines rights and obligations or "from which legal

4  consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted).  "The

5  finality doctrine is concerned with whether the initial decisionmaker has arrived at a definitive position on

6  the issue that inflicts an actual, concrete injury." *Indus. Customers of Nw. Utils. v. Bonneville Power*

7  *Admin.*, 408 F.3d 638, 645 (9th Cir. 2005).  "The core question is whether the agency has completed its

8  decisionmaking process, and whether the result of that process is one that will directly affect the parties."

9  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

10         For the purposes of this motion, the Federal Defendants have conceded that the challenged

11  Hatchery Listing Policy marks the "consummation" of the agency's decision-making process.  However,

12  the parties dispute whether the HLP determines rights and obligations or will cause legal consequences.

13  The parties agree that the critical issue is whether the HLP binds the agency.

14         The Federal Defendants argue that the HLP neither definitely binds the NMFS nor "finally

15  determines" the manner in which NMFS will treat hatchery-origin fish in any making its ESA listing

16  determination for any particular fish.   The Federal Defendants are correct that the HLP does not require

17  the NMFS to consider hatchery-origin fish in the context of any particular DPS.  They are also correct

18  that the HLP does not finally determine that hatchery-origin fish will be considered in any specified DPS.

19  However, unlike the factual scenario in *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D. Or.

20  2001), in which the plaintiffs challenged a final rule listing coho salmon as "threatened," Plaintiffs in the

21  instant action directly challenge the HLP itself rather than a particular listing determination.  Thus, the

22  Federal Defendants' arguments regarding the relationship of the HLP to a listing determination for any

23  particular fish are irrelevant to the finality analysis that must be performed in the case at bar.  Instead, the

24  questions that must be answered are (1) does the HLP finally determine how NMFS will treat hatchery

25  fish during the listing process; and (2) whether the HLP binds the agency or whether it is "merely a

26  ORDER – 6

1    guidance document that can be ignored." (*See* Pls.' Opp'n 5.)

2        The Federal Defendants point out that the HLP describes itself as a "general statement of policy,"

3    and as such may be modified or deviated from at any time, either in the course of any specific listing

4    determination or by issuing a superceding policy.  The Federal Defendants also point to several instances

5    of permissive, rather than mandatory, language in the policy.

6        The fact that the HLP may be modified at any time is not dispositive.  Simply because it may be

7    modified at any time, and even if it may be modified without notice, does not mean that it does not bind

8    the agency or otherwise dictate the manner in which the NMFS makes listing determinations while it

9    remains unmodified.

10       As for the policy's language, the Federal Defendants argue that "[t]he primary consideration in

11   determining an agency's intent . . . is 'whether the text of the agency statement indicates that it was

12   designed to be binding on the agency.'"  (Fed. Defs.' Reply 3 (quoting *Farrell v. Dep't of Interior*, 314

13   F.3d 584, 591 (Fed. Cir. 2002).)  In addition, the Federal Defendants argue that the Court should give the

14   NMFS's description of the HLP's character some deference.  While an agency's characterization of its

15   pronouncements are entitled to some deference, they are not determinative.  *See, e.g.*, *Nat'l Ass'n of*

16   *Homebuilders v. Norton*, 415 F.3d 8, 14 (D.C. Cir. 2005) ("An agency's past characterization of its own

17   action, while not decisive, is entitled to respect in a finality analysis.").

18       A careful reading of the text reveals the HLP, despite some permissive language, to be mandatory

19   in its key operative parts.  Here, the HLP is expressly labeled a "general statement of policy."  70 Fed.

20   Reg. at 37,215 (explaining why the HLP is not subject to 5 U.S.C. § 553's notice and comment

21   procedures).  The HLP also repeatedly employs phrases such as "provides direction" that are less than

22   mandatory in nature.  However, the step-by-step process for the NMFS's consideration of hatchery fish

23   in any given DPS is *not* optional.  The HLP mandates that "NMFS *will* identify all components of the

24   ESU, including populations of natural fish . . . and hatchery stocks that are part of the ESU."  70 Fed.

25   Reg. at 37,215 (emphasis added).  The HLP goes on to mandate that hatchery stocks meeting given

26   ORDER – 7

genetic divergence criteria "(a) *are* considered part of the ESU; (b) *will be* considered in determining whether an ESU should be listed . . .; and (c) *will be* included in any listing of the ESU." *Id.* (emphasis added). Thus, the HLP, despite some permissive language, is straightforward in (1) requiring that hatchery stocks be considered in determining the composition of an ESU, and (2) requiring that hatchery stocks meeting certain criteria be included in the ESU. These critical portions of the HLP are not accompanied by any language suggesting that NMFS personnel would be free to deviate from this procedure, *i.e.*, that they could decline to consider hatchery fish in identifying the components of an ESU, or that they could decline to exclude hatchery fish meeting the genetic divergence criteria from the ESU and any possible listing of that ESU. Therefore, the Court finds that HLP does, indeed, bind the NMFS to consider hatchery fish, and include hatchery fish if certain criteria are met, in making its ESA listing determinations.

In addition to the binding nature of the HLP, the Court also finds that the HLP "amounts to a definitive statement of the agency's position." *Indus. Customers*, 408 F.3d at 646 (identifying factors which can provide "indicia of finality"). The HLP is described as the NMFS's "final policy addressing the role of" hatchery fish in ESA listing determinations. The process prescribed in the HLP for considering hatchery fish recognize and execute on the NMFS's position that "genetic resources that represent the ecological and genetic diversity of [a] species . . . can reside in a fish spawned in a hatchery as well as in a fish spawned in the wild." 70 Fed. Reg. at 37,215.

Because the HLP binds the NMFS and because it is a definitive statement of the agency's position, the Court finds that the HLP satisfies the second prong of the *Bennett* finality test. Therefore, the NMFS's adoption of the HLP amounts to a final agency action suitable for judicial review. Accordingly, Defendants' motion to dismiss Plaintiffs' First Amended Complaint for failure to challenge a final agency action shall be DENIED.

ORDER – 8

IV.   CONCLUSION

In accordance with the foregoing, the Federal Defendants' motion to dismiss is hereby DENIED.

SO ORDERED this 30th day of November, 2005.

_____
UNITED STATES DISTRICT JUDGE

ORDER – 9