1

2

3

4

5

6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

7 TROUT UNLIMITED; NATIONAL
WILDLIFE FEDERATION; OREGON
8 NATURAL RESOURCES COUNCIL
FUND; PACIFIC COAST
9 FEDERATION OF FISHERMEN'S
ASSOCIATIONS; INSTITUTE FOR
10 FISHERIES RESOURCES;
FEDERATION OF FLY FISHERS; and
11 PACIFIC RIVERS COUNCIL,

12                    Plaintiffs,

13        and                                      CASE NO. CV05-1128-JCC

14 BUILDING INDUSTRY                               ORDER
ASSOCIATION OF WASHINGTON;
15 WASHINGTON STATE FARM
BUREAU; WASHINGTON STATE
16 POTATO COMMISSION; COALITION
FOR IDAHO WATER; and IDAHO
17 WATER USERS ASSOCIATION,

18                    Intervenor-Plaintiffs,

19        v.

20 D. ROBERT LOHN, in his official
capacity as Regional Administrator of
21 NMFS Northwest Regional Office; and
NATIONAL MARINE FISHERIES
22 SERVICE,

23                    Defendants.

24

25

ORDER – 1

This matter comes before the Court on the Motion of Plaintiffs Trout Unlimited, *et al.* (collectively "TU") for Summary Judgment (Dkt. No. 84), the Motion of Intervenor-Plaintiffs Building Industry Association of Washington, *et al.* (collectively "BIAW") for Summary Judgment (Dkt. No. 94), and the Cross-Motion of Defendants National Marine Fisheries Service, *et al.* (collectively "NMFS") for Summary Judgment (Dkt. No. 103).  Having considered the briefs of the parties, the supporting declarations and exhibits, and the administrative record, and having concluded that oral argument is unnecessary, the Court hereby finds and rules as follows.

## I.      Background

TU brings this challenge to NMFS's Policy on the Consideration of Hatchery-Origin Fish in Endangered Species Act Listing Determinations for Pacific Salmon and Steelhead ("HLP"), 70 Fed. Reg. 37,204 (June 28, 2005).  The HLP provides guidance on how hatchery-raised fish are to be treated when making decisions about whether salmon and steelhead populations should be listed as endangered or threatened under the Endangered Species Act ("ESA").  The HLP directs that, so long as they are sufficiently genetically similar, hatchery and wild, or naturally spawning, fish of the same species will be considered the same "species," will both be analyzed in decided whether the species is threatened or endangered, and if so, will both be listed as such.  In order to fully understand this policy and the effect TU alleges it will have on wild salmon and steelhead populations, it is necessary to understand a bit about the affected species themselves and several other NMFS policies related to the ESA.

**A.      Salmon and Steelhead**

Salmon and steelhead[1] are species of anadromous fish that are well-adapted for their strange life cycles.  Their lives begin when they emerge from eggs deposited in fresh-water rivers and

---

[1] Five species of salmon are found in the Pacific Northwest—chinook, coho, sockeye, pink, and chum. (Dkt. No. 84 at 2.)

streams: in the Pacific Northwest, those waterways include the Columbia River and its major tributaries, such as the Willamette River and the Snake River. They live and grow for a year or more in these fresh-water streams before beginning one of at least two migrations that will occur in an average life cycle—down to the ocean. Once in the salt water, they feed and mature for between two and five years, depending on the species. After reaching maturity, adult salmon begin their second migration, which can be thousands of miles, back to their natal stream. There they compete for mates, build nests where they deposit and fertilize their eggs, and die. Adult steelhead complete the same return migration to their freshwater origins, but they are able to survive the spawning; some spawn a second or even a third time. (Dkt. No. 84 at 2; AR 353.)

The long evolutionary history of salmon and steelhead species has resulted in populations that are genetically and behaviorally diverse. Populations can vary greatly even if geographically close, depending on the conditions in the natal stream. Despite their ability to survive the catastrophic events of millions of years of evolution, salmon and steelhead populations have experienced dangerous declines in numbers since the commencement of European settlement of the Pacific Northwest, due to habitat degradation and overfishing, among other factors. Accordingly, NMFS began listing populations as threatened or endangered under the ESA in 1989. Twenty-six populations of salmon and steelhead are currently listed under the ESA. 70 Fed. Reg. 37,160 (June 28, 2005); 71 Fed. Reg. 834 (Jan. 5, 2006).

**B.    Hatchery Fish**

Hatchery-born salmon and steelhead have a different life cycle from salmon and steelhead that are born in the wild, because a substantial portion of their lives is spent within the hatchery confines. Hatchery fish are produced by killing returning adult females, harvesting their eggs, and fertilizing them with the sperm of returning adult males. Young salmon are fed and kept within the

hatchery for their freshwater growth period.  Then they are released to complete their migration to the ocean, as wild salmon do.  They complete the second migration back to the natal stream and to the hatchery, where adults are killed and the assisted fertilization process is repeated.  Because hatchery fish spend a significant portion of their lives in an ocean environment shared by wild fish, and can migrate through some of the same areas, hatchery fish sometimes mate and spawn in the wild.

**C.      Other NMFS Policies Related to the ESA**

The ESA provides the Secretary of the Interior and the Secretary of Commerce[2] the authority to decide whether to list species as endangered or threatened, based on criteria that are statutorily set.  16 U.S.C. § 1533(a)(1).  "Species" is defined to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  *Id.* § 1532(16).  The term "distinct population segment" ("DPS") is not further defined in the statute.

**1.      1991 ESU Policy**

NMFS issued a policy in 1991 that interpreted the statutory term "distinct population segment" as applied to Pacific salmon.  *Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific Salmon*, 56 Fed. Reg. 58,612 (Nov. 20, 1991).  In this policy, the agency determined that a salmon stock would be considered a DPS only if it was an evolutionarily significant unit ("ESU") of the biological species.[3]  In order to be considered an ESU, the salmon stock must be (1) substantially reproductively isolated from other conspecific population units, and (2) represent an important component in the evolutionary legacy of the species.  As to the first

---

[2] The Secretary of the Interior is authorized to make listing determinations as to terrestrial and freshwater species, while the Secretary of Commerce makes listing determinations as to marine and anadromous species.  16 U.S.C. § 1532(15).
[3] The term ESU is essentially a synonym of DPS, as applied to salmon and steelhead populations.

criterion of reproductive isolation, the policy stated that the isolation "does not have to be absolute, but it must be strong enough to permit evolutionarily important differences to accrue in different population units." *Id.* As to the second criterion, the policy defined the evolutionary legacy of a species as "the genetic variability that is a product of past evolutionary events and which represents the reservoir upon which future evolutionary potential depends." *Id.* In other words, "if the population became extinct, would this event represent a significant loss to the ecological/genetic diversity of the species?" *Id.* If so, the population represents an important component of the species' evolutionary legacy. The term "evolutionarily significant unit" was given a meaning that focused on genetic factors based on a finding that "a major motivating factor behind the ESA was the desire to preserve a genetic variability, both between and within species." *Id.*

## 2.     1993 Interim Hatchery Policy

Two years after issuing the ESU policy, NMFS issued an interim policy on the narrower question of how hatchery fish should figure into listing decisions under the ESA. *Interim Policy on Artificial Propagation of Pacific Salmon Under the Endangered Species Act*, 58 Fed. Reg. 17,573 (Apr. 5, 1993). The policy envisioned a limited role for hatchery fish and hatcheries in listing decisions and species recovery efforts. The policy interpreted the ESA as "mandat[ing] the restoration of threatened and endangered species in their natural habitats to a level at which they can sustain themselves without further legal protection. For Pacific salmon . . . , the ESA's focus is, therefore, on natural populations—the progeny of naturally spawning fish—and the ecosystems upon which they depend." *Id.* However, the policy acknowledged that this central purpose of restoring natural populations in their natural habitats to levels where they are able to sustain themselves could in some instances be furthered by artificial means, including through the use of hatcheries. Accordingly:

> Artificial propagation may represent a potential method to conserve listed salmon species when the artificially propagated fish are determined similar to the listed natural population in genetic, phenotypic, and life-history traits, and in habitat use characteristics.  Regardless of this, however, evaluations of the status of the population under the ESA depend on the viability of the population in the natural habitat and on the status of ongoing conservation measures.

*Id.* at 17,574.

The policy underscored the substantial uncertainty about the efficacy of artificial propagation as a means to increase natural populations, and advised that "consideration of its use should be based on an objective assessment of the genetic and ecological risks, balancing the potential for deleterious effects against risk to the population of irreversible harm or extinction if artificial propagation is not implemented."  *Id.*  The policy described the genetic and ecological risks artificial propagation poses to wild populations.  The genetic risks of artificial propagation include: (1) erosion of genetic variability and reduced fitness in the wild population caused by the reduction in population attendant with the taking of wild broodstock; (2) reduction in the genetic differences between natural populations due to the higher straying rates among hatchery fish, transfers of fish among hatcheries, and transplanting fish outside their natural areas; and (3) adaptation to hatchery conditions and domestication that causes a genetic divide between the hatchery population and the natural population and increases the adverse consequences of interbreeding between the populations.  *Id.*  The ecological risks include: increased competition and predation, displacement of natural fish, altered migratory and spawning behavior, and disease transfer.

Having considered these not insubstantial risks that hatcheries pose to the preservation of natural salmon populations and their habitats, the policy set out guidelines for (1) considering hatchery fish in making listing determinations, and (2) using hatcheries as a conservation tool in recovery plans.  As to the first question, the policy reaffirmed the 1991 ESU Policy's interpretation

ORDER – 6

of the statutory term "distinct population segment" as depending on (1) reproductive isolation, and (2) contribution to the biological species' evolutionary legacy. *Id.* Accordingly, "[c]oncurrent with a determination to list a salmon species under the ESA, a determination should be made whether any existing hatchery fish can be considered part of the biological ESU and whether or not the hatchery fish should be included as part of the listed species." *Id.*

Hatchery fish would not be considered part of the biological ESU and therefore would not be included in the listed species if:

> (1) the hatchery population in question is of a different genetic lineage than the listed natural populations,
>
> (2) artificial propagation has produced appreciable changes in the hatchery population in characteristics that are believed to have a genetic basis, or
>
> (3) there is substantial uncertainty about the relationship between existing hatchery fish and the natural population.

*Id.* at 17,575. These factors are analogous to the factors of reproductive isolation and evolutionary legacy listed in the ESU Policy and similarly appear designed to interrogate the genetic similarity between the hatchery and natural populations.

For hatchery fish who were determined to be part of the same ESU as a natural population based on the genetic relationship, the policy anticipated that a decision must be made as to whether or not hatchery fish should be included as part of the listed species. It provided that in general, hatchery fish would not be included as part of the listed species. *Id.* Thus, even if hatchery fish were determined to be sufficiently genetically related to the natural population to be part of the same ESU, they were usually not to be included in the listed population and subject to the protections of the ESA. Only if the hatchery fish were "essential for recovery"—as in cases where the natural population faced a high short-term risk of extinction, or the hatchery population was believed to contain a substantial portion of the genetic diversity remaining in the species—would the hatchery

fish be listed as well.  Thus, the treatment of hatchery fish under the 1993 Interim Hatchery Policy was keyed to the genetic relationship between the hatchery fish and the natural populations, with a focus on maintaining the genetic diversity of the natural population.

Likewise, the policy counseled that artificial propagation should have a limited role in recovery efforts.  Artificial propagation should only be used when the primary recovery strategy of addressing the factors that led to a species' decline would not produce recovery within an acceptable time, and that it should not be seen as a substitute for addressing those underlying factors.  In essence, "artificial propagation should be viewed as a temporary measure, to be held to the minimum necessary for recovery." *Id.*

3.    *Alsea Valley Alliance v. Evans*

In 1998, NMFS applied the 1991 ESU Policy and the 1993 Interim Policy in determining that the Oregon coast ESU of coho salmon should be listed as threatened.  *Threatened Status for the Oregon Coast Evolutionarily Significant Unit of Coho Salmon*, 63 Fed. Reg. 42,587 (Aug. 10, 1998).  This rule determined that nine Oregon hatchery populations were part of the same ESU as natural populations of the Oregon Coast coho salmon.[4]  However, because none of these hatchery stocks were essential for the species' recovery, they were not listed as threatened along with the natural population.  *Id.* at 42,589.  Accordingly, the species listed as threatened was defined as "Oregon Coast coho salmon . . . [including] all naturally spawned populations of coho salmon in streams south of the Columbia River and north of Cape Blanco in Curry County, OR." *Id.* at 42,591.

NMFS's listing determination was challenged in Oregon's federal district court.  *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D. Or. 2001).  Plaintiffs alleged that the distinction

---

[4] As to four other hatchery populations, NMFS determined that they were either not part of the ESU, or of uncertain relationship to the ESU.  *Id.* at 42,589.

between naturally spawned and hatchery fish in the Oregon Coast coho listing rule was "arbitrary and capricious" in violation of the Administrative Procedures Act, 5 U.S.C. § 706.  Plaintiffs argued that the ESA does not permit NMFS to distinguish between hatchery and wild salmon when making listing decisions, because it cannot make listing distinctions below that of species, subspecies, or distinct population segment.  16 U.S.C. § 1532(16).  The Court held that the listing determination was indeed arbitrary and capricious, finding that it relied on factors upon which Congress did not intend it to rely.  *Alsea*, 161 F. Supp. 2d at 1161.

The Court reasoned that NMFS's adoption of the "evolutionarily significant unit" and its definition in the ESU Policy constituted a "permissible agency construction of the ESA," because it relied on factors of geography and genetics, which Congress had indicated were acceptable considerations.  *Id.*  However, the Court concluded, based on the ESA's definition of "species," and a single case from the United States District Court of Arizona, *Southwest Center for Biological Diversity v. Babbitt*, 980 F. Supp. 1080 (D. Ariz. 1997),[5] that "distinctions below that of subspecies or a DPS of a species are not allowed under the ESA."  *Alsea*, 161 F. Supp. 2d at 1162.  Once NMFS determined that hatchery coho and natural coho were part of the same ESU, the Court held, "the listing decision should have been made without further distinctions between members of the

---

[5] *Southwest Center for Biological Diversity v. Babbitt* does not appear to support the point for which it is cited in the *Alsea* decision.  It is cited as support for the Court's conclusion that "[l]isting distinctions below that of a subspecies or a DPS of a species are not allowed under the ESA."  *Alsea*, 161 F. Supp. 2d at 1162.  *Southwest Center* concerned whether the United States Fish and Wildlife Service's Final DPS Policy—which formed the basis for the denial of a petition to list a DPS of multiple subspecies of northern goshawk—violated the ESA.  The Final DPS Policy stated that "the organisms in a population are members of a single species or lesser taxon," which FWS interpreted to require that there be only one subspecies in a single designated DPS application.  61 Fed. Reg. 4722 (Feb. 7, 1996); *Southwest Center*, 980 F. Supp. at 1083.  The Court rejected that interpretation, and held that "if Congress had intended that a DPS contain only one subspecies, it would have allowed only the listing of 'DPSs' of subspecies.  Instead, the statute reads 'any distinct population segment of any species.'"  980 F. Supp. at 1085.  While both cases parse the language of 16 U.S.C. § 1532(16), reading the statute not to preclude multiple subspecies in one DPS is not the same as reading the statute to preclude listing distinctions below that of a subspecies or a DPS of a species.

same DPS/ESU." *Id.* The listing distinction could have been proper, if hatchery and natural coho were in separate ESUs, but the Court expressed doubt that this was possible.

> Here, hatchery spawned coho are likely not substantially reproductively isolated from naturally spawned coho because, once released from the hatchery, it is undisputed that hatchery spawned coho and naturally spawned coho within the Oregon Coast ESU share the same rivers, habitat and seasonal runs. It is undisputed that hatchery spawned coho may account for as much as 87% of the naturally spawning coho in the Oregon Coast ESU. In addition, hatchery spawned and natural coho are the same species and interbreed when mature. Finally, the NMFS considers progeny of hatchery fish that are born in the wild as naturally spawned coho that deserve listing protection.

*Id.* at 1162–63 (internal citations omitted). Having so concluded, the Court found that the listing was arbitrary and capricious and therefore unlawful, and remanded the matter to the agency for further consideration. *Id.* at 1163.

### 4.     Final Hatchery Listing Policy

After the *Alsea* decision was issued, NMFS decided to amend the 1993 Interim Hatchery Policy.[6] It announced its intention to revise, 67 Fed. Reg. 6215 (Feb. 11, 2002), and on June 3, 2004, published a proposed policy for the consideration of hatchery-origin fish in ESA listing determinations. 69 Fed. Reg. 31,354. With the proposed policy, NFMS announced a 90-day public comment period which ended up being extended through November 12, 2004, a total of 162 days. 70 Fed. Reg. at 37,206. It received over 27,000 comments on the policy. *Id.* In addition, NMFS held fourteen public hearings across the Pacific Northwest and California. *Id.* Further, it solicited

---

[6] NMFS declined to appeal this ruling, and instead submitted to the district court a four-part "Action Plan" that involved reformulating listing standards for salmon ESUs that contain both hatchery and wild fish and re-evaluating all current listings in light of the new standards. *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1183 (9th Cir. 2004). Since it was apparent that the ruling would not be appealed, a group of fishery and conservation organizations sought, and were granted, permission from the district court to intervene for the purposes of appealing the district court's remand order. The Ninth Circuit held that it was without jurisdiction to hear the appeal on the merits, however, concluding that the remand order was not "final," under 28 U.S.C. § 1291 or relevant case law. *Id.* at 1184.

ORDER – 10

1   technical review of the policy from over 50 independent experts from a variety of sectors, and

2   received comments from four.  *Id.*

3          In the Final Hatchery Listing Policy, NMFS reaffirmed the commitment of the 1991 ESU

4   Policy to maintaining genetic diversity by requiring that an ESU be both substantially

5   reproductively isolated from other conspecific population units, and represent an important

6   component of the evolutionary legacy of the species.  *Id.* at 37,215.  However, the Final Hatchery

7   Listing Policy represented a departure from the Interim Hatchery Policy in that hatchery fish were to

8   be considered both in determinations as to whether ESUs should be listed, and in any listing of the

9   ESU of which they are a part.

10         In delineating an ESU to be considered for listing, NMFS will identify all
           components of the ESU, including populations of natural fish (natural populations)
11         and hatchery stocks that are part of the ESU.  Hatchery stocks with a level of genetic
           divergence relative to the local natural population(s) that is no more than what
12         occurs within the ESU: (a) are considered part of the ESU; (b) will be considered in
           determining whether an ESU should be listed under the ESA; and (c) will be
13         included in any listing of the ESU.

14  *Id.* at 37,215.

15         Status determinations were to be made with the goal of conserving natural self-sustaining

16  populations in mind.  In making such determinations, NMFS would consider four indicators of the

17  health of a population: abundance, productivity, genetic diversity, and spatial distribution.  *Id.*  It

18  was anticipated that hatchery fish could affect the status of the ESU in both positive and negative

19  ways:

20         The presence of hatchery fish within the ESU can positively affect the overall status
           of the ESU, and thereby affect a listing determination, by contributing to increasing
21         abundance and productivity of the natural populations in the ESU, by improving
           spatial distribution, by serving as a source population for repopulating unoccupied
22         habitat, and by conserving genetic resources of depressed natural populations in the
           ESU.  Conversely, a hatchery program managed without adequate consideration of
23         its conservation effects can affect a listing determination by reducing adaptive

24

25

ORDER – 11

genetic diversity of the ESU, and by reducing the reproductive fitness and productivity of the ESU.

*Id.*

## II.   The Parties and Claims

Plaintiffs are conservation and fishery organizations whose members use the watersheds in Washington, Oregon, Idaho, and California that are home to the Pacific salmon and steelhead for recreational, scientific, aesthetic, and commercial purposes. (Dkt. No. 1 at 4.) They allege that the interests of their members in enjoying continued benefits from the existence of Pacific salmon and steelhead are directly and adversely affected by Defendants' alleged failures to follow environmental laws.

Defendants are the National Marine Fisheries Service, an agency of the United States Department of Commerce that is responsible for administering the ESA as to threatened and endangered marine and anadromous species, and D. Robert Lohn, in his official capacity as Regional Administrator of the NMFS Northwest Regional Office.

Intervenors are trade associations and advocacy organizations who advance agricultural interests, fight land and water use regulations, and seek to reform environmental laws to make them compatible with land use, water use, and private property rights. They fear that needless listings of salmon and steelhead populations will impede their members' livelihoods. (Dkt. No. 24.)

TU seeks summary judgment on its claims that NMFS violated the ESA and NEPA in adopting the HLP. First, TU claims that the HLP violates the ESA by allowing hatchery fish to dilute the protections available to wild salmon, thus departing from the ESA's central purpose of protecting self-sustaining populations in their natural habitats. Second, TU claims that NMFS violated the ESA's mandate that its listing determinations be made "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Third, TU claims that

NMFS violated NEPA by failing to prepare an environmental impact statement ("EIS") or an environmental assessment ("EA") before adopting the policy.

BIAW also seeks summary judgment, arguing that the HLP permits NMFS to draw distinctions between hatchery and wild salmon that are impermissible under the ESA.

NMFS cross-moves for summary judgment, and argues that the ESA claims of TU and BIAW fail because they are not ripe; NMFS also defends these claims on the merits.  NMFS argues that BIAW's claim fails because it does not have standing, and because its contentions are meritless. NMFS argues that TU's NEPA claim fails because TU does not have standing to pursue it, and that even if it does have standing, NEPA is inapplicable to the policy as a matter of law.

### III.     Standard of Review

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

TU and BIAW seek review of their claims under the Administrative Procedures Act, 5 U.S.C. §§ 551–59, 701–06.  Under the APA, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### IV.     Analysis

**A.     Endangered Species Act Claims**

**1.     ESA Framework**

Finding that various species of plants, fish, and wildlife of value to the United States and its citizens had become extinct or were threatened with extinction, Congress adopted the ESA as "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Accordingly, Section 4(a) of the ESA requires the Secretary to determine whether a species is endangered or threatened because of any of five specifically enumerated factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a). A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The Secretary must make a determination as to whether a species is threatened or endangered "solely on the basis of the best scientific and commercial data available to him." *Id.* § 1533(b)(1)(A).

When a species is designated as threatened or endangered, the Secretary must also designate critical habitat, areas essential to the conservation of the species which may require special management considerations or protections. *Id.* §§ 1532(5)(A), 1533(a)(3). Once a species has been listed and critical habitat is designated, federal agencies are prohibited from taking actions "likely to jeopardize the continued existence of any endangered . . . or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2). The Secretary must also develop and implement plans for the conservation and recovery of endangered

1    species to the point where they are no longer in need of the ESA's protections.  *Id.* §§ 1532(3),

2    1533(f).

3    **2.      TU's and BIAW's ESA Claims**

4             TU claims that the HLP violates the ESA by allowing hatchery fish to dilute the protections

5    available to wild salmon, thus departing from the ESA's central purpose of protecting self-

6    sustaining populations in their natural habitats.  TU also claims that NMFS violated the ESA's

7    mandate that its listing determinations be made "solely on the basis of the best scientific and

8    commercial data available."  16 U.S.C. § 1533(b)(1)(A).  BIAW argues that the HLP permits

9    NMFS to draw distinctions between hatchery and wild salmon that are impermissible under the

10   ESA.

11            NMFS first argues that the Court lacks jurisdiction to consider these claims because they are

12   not ripe.  NMFS also argues that the Court lacks jurisdiction to consider BIAW's claim because

13   BIAW lacks standing.  (Dkt. No. 103 at 19–25.)  Because the Court concludes that all the ESA

14   claims should be dismissed on ripeness grounds, it is not necessary to reach NMFS's standing

15   argument.

16   **3.      Ripeness**

17            Ripeness is a justiciability doctrine designed to "prevent the courts, through avoidance of

18   premature adjudication, from entangling themselves in abstract disagreements over administrative

19   policies, and also to protect the agencies from judicial interference until an administrative decision

20   has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs.*

21   *v. Gardner*, 387 U.S. 136, 148–49 (1967).  In determining whether agency action is ripe for judicial

22   review, a court must analyze (1) the hardship to the parties of withholding judicial consideration,

23   and (2) the fitness of the issues for judicial decision.  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S.

24

25

726, 733 (1998).  Factors relevant to the question of fitness include: (1) whether the question is a

purely legal one, and (2) whether the regulation disputed is a "final agency action" under the APA,

5 U.S.C. § 704.  *Abbott*, 387 U.S. at 149.  Showing hardship requires a demonstration that

"withholding review would result in direct and immediate hardship and would entail more than

possible financial loss."  *W. Oil and Gas Ass'n v. Sonoma County*, 905 F.2d 1287, 1291 (9th Cir.

1990) (internal quotation marks omitted).

The Court cannot discern what hardship might face the parties if the Court declines to

review the ESA claims here.  TU has brought an independent challenge to an application of the HLP

that resulted in the downlisting of the Upper Columbia River steelhead ESU from endangered to

threatened.  *Trout Unlimited v. Lohn*, CV06-0483-JCC (*Trout II*).  *Trout II* includes an identical

facial challenge to the HLP.  The administrative record in *Trout II* includes documents related not

only to the development of the HLP, but also to the application of that policy in the context of the

downlisting of the Upper Columbia River steelhead ESU.  The Court's final order disposing of the

summary judgment motions in *Trout II* is being issued contemporaneously with this order.  The

Court elects to consider the parties' ESA claims in the context of *Trout II*'s fuller administrative

record, and finds that *Trout II* precludes TU and BIAW from being able to demonstrate that any

hardship will befall them if the Court considers the ESA claims in the context of *Trout II*, as

opposed to here.  Accordingly, the Court declines to consider the ESA claims on ripeness grounds.

**B.      TU's National Environmental Protection Act Claim**

TU argues that NMFS violated NEPA by failing to prepare an EIS or EA for the HLP.

NMFS argues that TU does not have standing to bring this claim, and that even if TU does have

standing, policies providing guidance for ESA listing determinations are exempt from NEPA as a matter of law.[7]

## 1.     Standing

To satisfy the constitutional requirements of Article III standing, a plaintiff must demonstrate that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
> (2) the injury is fairly traceable to the challenged action of the defendant; and
> (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000).[8]  An association has standing to bring a claim on behalf of its members when its members would individually have standing, the interests asserted are germane to the purposes of the organization, and neither the claim asserted nor the relief requested requires the individual participation of the members. *Id.* at 181.

---

[7] BIAW advances no argument as to the applicability of NEPA.

[8] In addition to satisfying the constitutional standing requirements, TU must also show that the APA statutory standing requirements are satisfied.  Specifically, TU must show "(1) that there has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the 'zone of interests' of the statutory provision the plaintiff claims was violated." *Churchill County v. Babbitt*, 150 F.3d 1072, 1078 (9th Cir. 1998), *amended by* 158 F.3d 491 (9th Cir. 1998).  NMFS does not challenge TU's statutory standing, but it is clear that the statutory standing requirements are satisfied.  The Court has already held that this is a final agency action.  (Dkt. No. 27.)

It is equally clear that the injuries TU alleges fall within the zone of interested protected by NEPA.  NEPA was enacted "'to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man.'  The purpose of NEPA is to protect the environment." *Nevada Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) (quoting 42 U.S.C. § 4321).  Plaintiffs allege injury to the "recreational, scientific, aesthetic, and commercial benefits [they enjoy] from the existence in the wild of salmon and steelhead."  (Dkt. No. 75 at 6.)  These injuries fall within the ambit of the interests protected by NEPA.

1       The Court has no trouble concluding that TU has alleged a sufficiently concrete and

2   particularized harm to satisfy the Article III requirement of an injury in fact.[9]  For instance, Plaintiff

3   Pacific Coast Federation of Fishermen's Associations ("PCFFA") is a trade organization of

4   commercial fishermen that seeks to protect and restore salmonid habitat as a means to ensure the

5   survival of commercial fishing as a way of life.  (Dkt. No. 87 at 3.)  PCFFA includes associations

6   and individual members whose livelihoods depend upon the salmon populations of the Columbia

7   River basin.  (*Id.* at 4.)  PCFFA alleges that the HLP poses a danger to the salmon populations upon

8   which their members depend.  PCFFA, and the other associational plaintiffs, assert sufficiently

9   concrete and particularized injuries on behalf of their members to satisfy the injury in fact

10  requirement of Article III standing.[10]

11      In addition to these concrete injuries, TU alleges that it has experienced procedural harms as

12  a result of NMFS's failure to prepare an EIS under NEPA.  (*See, e.g.*, Dkt. Nos. 87 at 9–10; 88 at 5;

13  89 at 4.)  To establish procedural standing, the plaintiff must show: (1) that it has been accorded a

14  procedural right to protect its concrete interests, and (2) that it has a threatened concrete interest that

15  is the ultimate basis of its standing.  *Churchill County v. Babbitt*, 150 F.3d 1072, 1078 (9th Cir.

16  1998).  NEPA imposes "procedural obligation[s] designed to assure that agencies give proper

17  consideration to the environmental consequences of their actions."  *Merrell v. Thomas*, 807 F.2d

18  776, 777–78 (9th Cir. 1986).  TU has been accorded a procedural right under NEPA to pursue the

19  concrete interests that establish TU's injuries in fact.

---

21  [9] NMFS does not challenge that TU has alleged an injury sufficient to satisfy the first prong of this
inquiry.  Nonetheless, this Court has an independent duty to ensure that the plaintiffs have standing under
Article III.  *Juidice v. Vail*, 430 U.S. 327, 331 (1977).

22  [10] Where one plaintiff among many has standing, the Court need not consider the standing of the others.
23  *Laub v. United States DOI*, 342 F.3d 1080, 1086 (9th Cir. 2003).  Likewise, NMFS makes no argument,
and the Court can discern no reason to find, that the interests asserted by the associational plaintiffs are
24  not germane to the interest of the organization, or that the litigation would require the participation of the
individual members.

1       While conceding that the bar is lowered with respect to causation and redressability in

2  instances of procedural standing, NMFS argues that TU has not shown that the injury it alleges was

3  caused by NMFS's failure to prepare an EIS, or that the injury can be redressed by requiring NMFS

4  to comply with NEPA.  Specifically, it asserts that TU cannot show that any harm it is experiencing

5  resulted from NMFS's failure to consider alternatives to the proposed action, as it is required to do

6  in an EIS, 42 U.S.C. § 4332(2)(C)(iii), because the preamble to the HLP indicates that alternative

7  approaches were presented in comments on the proposed policy, and considered by the agency.  70

8  Fed. Reg. at 37,208–09.  NMFS argues that because NMFS considered alternative approaches, TU's

9  harms cannot have been caused by the procedural injury it experienced as a result of NMFS failing

10  to prepare an EIS.  Further, requiring NMFS to prepare an EIS would not redress the injury TU

11  alleges.

12       The Supreme Court has noted that procedural rights are "special": "The person who has

13  been accorded a procedural right to protect his concrete interests can assert that right without

14  meeting all the normal standards for redressability and immediacy."  *Lujan v. Defenders of Wildlife*,

15  504 U.S. 555, 573 n.7 (1992).  In the Ninth Circuit, once a plaintiff has established an injury under

16  NEPA, the causation and redressability elements are "relaxed."  *Cantrell v. City of Long Beach*, 241

17  F.3d 674, 682 (9th Cir. 2001).  In cases where procedural harms are alleged, standing can be

18  established by showing that plaintiffs "have a procedural right that, if exercised, *could* protect their

19  concrete interests and that those interests fall within the zone of interests protected by the statute at

20  issue."  *Defenders of Wildlife v. Flowers*, 420 F.3d 946, 953 (9th Cir. 2005).

21       The causation requirement is "only implicated where the concern is that an injury caused by

22  a third party is too tenuously connected to the acts of the defendant."  *Citizens for Better Forestry v.*

23  *United States Dep't of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003).  The causation requirement is

24

25

ORDER – 19

designed to ensure that the plaintiff has haled the proper party into court: it examines "whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996).[11]  Because causation concerns only "whether plaintiffs' injury . . . is dependent upon [the agency's] policy, or is instead the result of independent incentives governing [the third parties'] decisionmaking process," *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1517–18 (9th Cir. 1992), there can be no question that TU has established causation sufficient to pursue its injury.

As for redressability, a plaintiff asserting procedural standing need not demonstrate that application of the procedure will benefit him. *Cantrell*, 241 F.3d at 682; *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995) (whether the findings of an EIS would affect the agency action allegedly requiring one is "not important").  Nor need he show that further analysis by the government would result in a different conclusion. *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001).  It is sufficient to show that the agency's decision "could be influenced by the environmental considerations that NEPA requires an agency to study." *Id.*  The comparison of alternatives contemplated under NEPA is more extensive than the consideration given by NMFS to the various comments it received in response to the proposed policy.  NEPA requires that the agency "[r]igorously explore and objectively evaluate all reasonable alternatives," and "[d]evote substantial treatment to each alternative considered in detail." 40 C.F.R. § 1502.14.  Accordingly, NMFS's argument that the superficial treatment it gave the proposed alternatives received in response to the

---

[11] To the extent that *Florida Audubon* imposes more stringent procedural standing requirements than those imposed in the Ninth Circuit, the Court notes that it is bound by the case law of this circuit: both in its procedural standing doctrine and in specifically declining to adopt *Florida Audubon*. *Citizens for Better Forestry*, 341 F.3d at 974.

proposed hatchery listing policy made NEPA compliance redundant is unpersuasive as a basis for divesting TU of standing to pursue its NEPA claim.

The Court finds that TU has adequately established both Article III and procedural standing, and now proceeds to consider the merits of its NEPA claim.

**2.     Merits**

NEPA requires that "to the fullest extent possible," agencies prepare an EIS for any major federal action significantly affecting the human environment.  42 U.S.C. § 4332(2)(C).[12]  The Supreme Court has held that NEPA's instruction that agencies comply with the EIS requirement "to the fullest extent possible" is "neither accidental nor hyperbolic."  *Flint Ridge*, 426 U.S. at 787.  The House and Senate conferees who drafted the phrase provide guidance as to its meaning:

> The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in [§ 102(2) of NEPA] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible. . . . Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance.

*Id.* at 787–88 (quoting 115 Cong. Rec. 39703 (1969) (House conferees)); *see also* 115 Cong. Rec. 40418 (Senate conferees).  On the other hand, and as this passage from the legislative history points

---

[12] The full text of the statute provides that:

> [T]o the fullest extent possible . . . all agencies of the Federal Government shall—
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>      (i) the environmental impact of the proposed action,
>      (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>      (iii) alternatives to the proposed action,
>      (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>      (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2).

out, "NEPA was not intended to repeal by implication any other statute." *United States v. SCRAP*, 412 U.S. 669, 694 (1973). Accordingly, starting with *Flint Ridge*, courts have found that only "clear and unavoidable conflicts in statutory authority" cause the requirements of NEPA to give way. *Flint Ridge*, 426 U.S. at 788.

Nothing on the face of NEPA excludes "general statements of policy," such as the HLP,[13] from the EIS requirement. "Policies" can be actions that require an EIS if they significantly affect the human environment. 40 C.F.R. § 1508.18(a) ("'Major federal action' includes . . . new or revised . . . policies"); 46 Fed. Reg. 18,026, 18,033 (1981) ("When are EISs required on policies, plans or programs? An EIS must be prepared if an agency proposes to implement a specific policy."). Though general statements of policy will usually be subject to the procedural requirements of NEPA, the Court concludes that a clear and unavoidable conflict in statutory authority exempts such statements of policy under the ESA.

Exemptions from the procedural requirements under NEPA fall into two overlapping categories—the first focuses on a direct conflict between statutory texts, and the second focuses on whether NEPA procedures will be redundant with those provided for under the statute seeking exemption. In the first category are three types of cases: First, there are cases in which there is an express exemption from the NEPA procedures in the statute itself. *See, e.g.*, *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1327 (9th Cir. 1992) (holding that "Congress carved out an exemption to NEPA for actions taken by the Administrator of the EPA pursuant to the CWA"). Second, there are cases in which a time limitation in the statute makes the preparation of an EIS impossible. *See, e.g.*, *Flint Ridge*, 426 U.S. at 788–89 (holding that a provision in the Interstate Land Sales Full Disclosure Act that requires that a statement of record become

---

[13] As noted in this Court's prior order (Dkt. No. 27 at 4–5), the HLP is a "general statement of policy" by NMFS's own assertion. *See, e.g.*, 70 Fed. Reg. at 37,215.

1    effective 30 days after filing unless the Secretary suspends it for inadequate disclosure makes the

2    preparation of an EIS "inconceivable"); *Westlands Water Dist. v. Natural Res. Def. Council*, 43

3    F.3d 457, 460 (9th Cir. 1994) (finding that statutory language requiring action "upon enactment"

4    precluded the imposition of an EIS requirement); *Merrell*, 807 F.2d at 778 (finding that a

5    requirement in the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") that the EPA

6    act "as expeditiously as possible" was a time constraint incompatible with preparation of an

7    EIS).  Third, there are cases in which the agency's action is so limited under the statute that

8    NEPA considerations cannot factor into the agency's analysis, making the production of an EIS a

9    fruitless exercise.  *See, e.g.*, *Pac. Legal Found. v. Andrus*, 657 F.2d 829, 836 (6th Cir. 1981)

10   ("[T]he statutory mandate of ESA prevents the Secretary from considering the environmental

11   impact when listing a species as endangered or threatened.  The Secretary is limited to using the

12   best scientific and commercial data on the five factors listed in the statute."); *id.* at 840

13   (concluding that "Congress intended listing of a species as endangered or threatened to be a

14   mandatory act dependent upon the five factors found in ESA and not upon environmental impact

15   concerns found in NEPA").  *Cf. Forelaws on Bd. v. Johnson*, 743 F.2d 677, 681 (9th Cir. 1984)

16   (rejecting an agency's argument that it should be exempt from NEPA's requirements where the

17   agency preserved a great deal of discretion over the actions it argued were mandated by statutes).

18           No party argues that either an express exemption or a time limitation creates a clear and

19   unavoidable statutory conflict here.  Thus, the Court too finds that neither of the first two types

20   of conflicts applicable to the present case.  However, relying on *Pacific Legal Foundation*,

21   NMFS argues that its discretion is so cabined by the substantive standards laid out in the ESA

22   that it could not consider the five factors required to be considered in filing an EIS.  657 F.2d at

23   835.  In *Pacific Legal Foundation*, the Sixth Circuit held that NEPA does not require the United

24

25

States Fish and Wildlife Service ("FWS") to file an EIS before listing a species as an endangered species pursuant to the ESA. *Pacific Legal Foundation* involved the listing as endangered of seven species of mollusks found in the Duck River in Tennessee. The listing halted the completion of the Columbia Dam project by the Tennessee Valley Authority that was designed to control the water level in the river and provide electricity. The Pacific Legal Foundation ("PLF") filed suit alleging that FWS's failure to file an EIS prior to listing the species was a violation of NEPA. FWS argued that a clear and unavoidable statutory conflict existed between NEPA and ESA.

The Sixth Circuit concluded that listing determinations under the ESA are exempt from the procedural requirements of NEPA. It noted that the factors that must be considered in determining whether a species is to be listed as threatened or endangered are statutorily enumerated, and that, therefore, the Secretary does not have the discretion to consider the factors examined in an EIS in making a listing determination.[14] Thus, the Court concluded that the filing of an impact statement does not and cannot serve the purposes of the ESA. *Id.* at 835. Accordingly, it made little sense to require the Secretary to comply with the EIS requirement when ultimately, the determination as to whether to list the species would be controlled by the factors enumerated in the ESA.

---

[14] The ESA requires the Secretary to determine whether a species is endangered or threatened because of any of the following: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). By contrast, NEPA requires that an EIS consider: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

NMFS argues that this consideration is directly applicable to the present case.  In so doing, it argues that the HLP, as a guidance document designed to assist the Secretary in making listing determinations, is an inseparable component of those listing decisions.  While it is not the case that a general policy providing guidance on listing determination is indistinguishable from the listing determinations for all purposes,[15] surely any guidance on listing determinations would necessarily remain true to the objectives of the ESA[16]—that is, the conservation of endangered and threatened species and the ecosystems on which they depend.  16 U.S.C. § 1531(b).  The purposes of these statutory schemes will often be in harmony, but to the extent that they are not, the considerations set out in the ESA control, and cabin the Secretary's discretion in drafting guidance documents as well as making listing determinations.  Thus, the statutory conflict found by the *Pacific Legal Foundation* Court is equally applicable in the present case.

In the second category of exemptions, courts have found that NEPA does not apply when procedures under another statute "displace" (or make "superfluous") the NEPA procedures, or provide the "functional equivalent" of the NEPA procedures.  Though both types of arguments concern a comparison between the procedures provided for in the statute in question and those in NEPA, functional equivalence doctrine simply looks to the procedures themselves; if they are sufficiently analogous, they will be held to be functional equivalents.  Displacement analysis, on

---

[15] For instance, a listing determination is a "rule" subject to notice and comment procedures under the APA.  16 U.S.C. § 1533(b)(4).  General statements of policy, by contrast, are exempt from notice and comment procedures.  5 U.S.C. § 553(b)(A).

[16] NMFS argues that TU has conceded the tight relationship between the HLP and listing determinations by invoking the ESA's "best available science" mandate against the HLP, though that standard technically only applies to listing determinations.  (Dkt. No. 103 at 55.)  TU does not provide any basis for concluding that while the best available science mandate applies to both listing determinations and guidance documents, the statutorily-prescribed substantive considerations that limit the Secretary's discretion in making listing determinations do not apply to guidance documents.  Accordingly, the Court concludes that the Secretary's discretion to consider factors outside those listed in 16 U.S.C. § 1533(a)(1) when drafting guidance documents is limited, as it is when making listing determinations.

ORDER – 25

1   the other hand, attempts to discern whether Congress intended for the statutory scheme to replace

2   the NEPA procedures; procedures that displace NEPA procedures are not necessarily analogous

3   to NEPA procedures. *Douglas County*, 48 F.3d at 1504 n.10 (contrasting the displacement

4   argument, which "asserts that Congress intended to displace one procedure with another" with

5   the functional equivalent argument, which is that "one process requires the same steps as

6   another").

7           The Ninth Circuit has relied on displacement analysis in holding that certain statutes,

8   including portions of the ESA, are exempt from NEPA. *See id.* at 1503 (ESA's procedures for

9   critical habitat designation make NEPA procedures "superfluous"); *Merrell*, 807 F.2d at 778

10  (legislative history and differences between the two procedural schemes indicate that Congress

11  intended to displace the NEPA procedures with the carefully crafted compromise procedures in

12  FIFRA). The Ninth Circuit has also made use of the functional equivalence rationale, though not

13  entirely without reservation. *See Merrell*, 807 F.2d at 781 ("While we hesitate to adopt the

14  'functional equivalence' rationale, we are confident that Congress did not intend NEPA to apply

15  to FIFRA registrations."); *Anchorage*, 980 F.2d at 1329 ("We are convinced that here . . . the

16  duties and obligations imposed on the EPA by Congress under the [Clean Water Act ("CWA")]

17  will insure that any action taken by the administrator under section 404(b)(1) will have been

18  subjected to the 'functional equivalent' of NEPA requirements.").

19          The Ninth Circuit has, in fact, applied displacement analysis in concluding that the

20  procedure Congress imposed in § 4(b) of the ESA for making critical habitat designations was

21  intended to displace the procedural requirements of NEPA. *Douglas County*, 48 F.3d at 1503.

22  There, the Court analyzed the legislative history of the 1978 amendments to the ESA, and

23  concluded that the procedures imposed in 16 U.S.C. § 1533(b) make the NEPA procedure

24

25

ORDER – 26

"superfluous." *Id.*  While *Douglas County* considered only the question of whether NEPA applies to critical habitat designations under the ESA, the Court notes that the ESA procedures it held displaced NEPA procedures apply both to critical habitat designations and listing determinations.  Thus, before NMFS takes any action which relies on the guidance provided in the HLP, it must, pursuant to the ESA:

> (1) publish a notice and the text of the designation in the Federal Register;
> (2) give actual notice and a copy of the designation to each state affected by it;
> (3) give notice to appropriate scientific organizations;
> (4) publish a summary of the designation in local newspapers of potentially affected areas; and
> (5) hold a public hearing if one is requested.

*Id.* (citing 16 U.S.C. § 1533(b)(5)).  These procedures are not directly applicable to general statements of policy under the ESA.  However, because NMFS must go through these procedures before effecting any listing determination or critical habitat designation that relies on the HLP, the Court is persuaded that the Ninth Circuit's reasoning in *Douglas County* that the ESA procedures have displaced those in NEPA is equally applicable to the present case.

Moreover, the imposition of the EIS requirement to the HLP would serve neither of the purposes of NEPA.

> The NEPA EIS requirement serves two purposes. First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.  Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (citation omitted).  Thus, the EIS has a two-pronged purpose: it is, first, "a procedural obligation designed to assure that agencies give proper consideration to the environmental consequences of their actions."  *Merrell*, 807 F.2d at

777–78.  Second, it insures that the public is informed about the environmental impact of proposed

agency actions.  *Douglas County*, 48 F.3d at 1498.

It is not clear that requiring NMFS to make a more rigorous investigation into alternative

approaches would ultimately have had any effect on the policy.  Though NMFS had concluded

that notice and comment procedures under the APA did not apply to the policy, 70 Fed. Reg. at

37,215, NMFS nonetheless provided notice to the public, sought public comment in a variety of

ways, and addressed the comments that it received, including alternatives that were proposed, in

the preamble to the final HLP.  NMFS published an announcement that it was revising the 1993

Interim policy, 67 Fed. Reg. 6215 (Feb. 11, 2002), and two years later, published the proposed

hatchery listing policy.  69 Fed. Reg. 31,354 (June 3, 2004).  It opened a comment period

intended to be 90 days long and extended it more than once, ultimately receiving over 27,000

comments from the public over a period of five and a half months.  70 Fed. Reg. at 37,206.

NMFS held fourteen public hearings across the Pacific Northwest and California.  *Id.*  Further, it

solicited technical review of the policy from over 50 independent experts from a variety of sectors,

and received comments from four.  *Id.*  The preamble to the HLP discusses the various

alternatives suggested in comments on the proposed policy, and indicates why NMFS did or did

not adopt them.  70 Fed. Reg. at 37,207–14.  Thus, there is no indication in the record that

requiring NMFS to draft an EIS, even with its more thorough review requirements, would have

changed the policy eventually adopted.  Further, the notice NMFS provided and the period in

which it received comments from the public served NEPA's second purpose of informing and

receiving input from the public.

TU points out that exempting from the NEPA requirements any government action for

which notice and comment procedures under the APA have been followed would dramatically

undermine the efficacy of NEPA.  The Court agrees, and does not hold that all government

actions subjected to notice and comment procedures are exempt from NEPA's procedural

requirements.  However, because the public had notice and opportunity to comment on the HLP,

and NMFS considered alternatives proposed in these comments, and because the ESA

procedures that displaced those of NEPA as to listing determinations and critical habitat

designations will apply to any action taken pursuant to the HLP, the Court is persuaded that the

purposes of NEPA have been served in the present case.

Another thread that runs throughout the NEPA exemption cases is consideration of

whether NEPA's purposes are in harmony with the purposes of the statute alleged for which a

NEPA exemption is being sought.  Courts are more likely to find a NEPA exemption if the

arguably exempt statute is designed to protect the environment.  Saliently, the decisions

exempting NMFS and the FWS from NEPA when making listing determinations and critical

habitat designations under the ESA, have cited the shared, conservationist purposes of NEPA

and the ESA as a reason for not applying NEPA.  *Pac. Legal Found. v. Andrus*, 657 F.2d at 837

("To require [the Secretary of the Interior] to file an impact statement would only hinder its

efforts at attaining the goal of improving the environment"); *Douglas County*, 48 F.3d at 1506

("We also find that NEPA does not apply to the designation of a critical habitat because the ESA

furthers the goals of NEPA without demanding an EIS."); *see also Anchorage*, 980 F.2d at 1329

("The purpose of NEPA is to ensure that federal agencies consider the environmental impact of

their actions.  Under the CWA, Congress has charged the Administrator of the EPA with the duty

of cleaning up the nation's navigable waters.  We are convinced that in the circumstances of this

case an exemption from NEPA will facilitate the EPA's efforts to clean up the nation's waters

while the statutory duties placed on EPA by Congress under the CWA properly ensure that the

Agency will consider the environmental impact of its actions."). *But see Jones v. Gordon*, 792

F.2d 821, 826–27 (9th Cir. 1986) (finding that requiring an EIS before issuing a permit to catch

killer whales "neither circumvents the language of the [Marine Mammal Protection Act] nor

violates its purpose; rather it promotes the predominant congressional purpose in enacting the

MMPA—the protection of marine mammals.").

The present case places the Court "squarely on the horns" of a dilemma. *Anchorage*, 980

F.2d at 1328. When applied to environmental statutes, NEPA's procedural requirements are

often seen as a hindrance to the effective implementation of those statutes' conservationist

purposes. Indeed, in *Pacific Legal Foundation*, the Sixth Circuit expressed concern that

applying NEPA's procedural requirements to listing determinations under the ESA might permit

NEPA to become "more of an obstructionist tactic to prevent environment-enhancing action than

it may already have become." 657 F.2d at 838. After considering the legislative history, that

court concluded that "NEPA was not intended to be applied to agencies whose function was to

protect the environment." *Id.* In the present case, however, the usual scenario is reversed. The

party asserting the conservationist interests is also the party calling for the application of the

"slow down" NEPA procedures to be applied. The Ninth Circuit confronted a similar dilemma

when asked to provide a complete exemption from NEPA for the EPA.

> A complete exemption from NEPA requirements would enable EPA to act more
> expeditiously in fulfilling its purpose of protecting the environment. Thus, as has
> been recognized, completely exempting EPA from NEPA seems to best serve the
> objective of protecting the environment which is the purpose of NEPA. However, it
> cannot be assumed that EPA will always be the good guy. Indeed, some have
> suggested that a complete exemption from NEPA requirements for EPA will result in
> no one policing the police.

*Anchorage*, 980 F.2d at 1328 (citations omitted).

In the present case, the Court is persuaded that the decision to exempt the HLP from NEPA procedures does no harm to the shared conservationist purposes of NEPA and the ESA.  NEPA advances its environmental purpose via limited procedural guarantees.  When, as here, those procedures have been displaced by the procedures found in another environmental statute, and a direct statutory conflict exists, *Pacific Legal Foundation*, 657 F.2d at 836, the conservationist purpose of NEPA is not extinguished; it merely finds expression elsewhere.  The procedural guarantees in the ESA adequately ensure that the HLP will be applied in a way that is consistent with the ESA's fundamentally environmentalist purpose—the conservation of endangered and threatened species and the ecosystems upon which they depend.  16 U.S.C. § 1531(b).

**C.      Motion to Strike**

Because this decision does not rely on the documents NMFS seeks to strike, it is unnecessary at this time to consider whether they should be stricken.

### V.      Conclusion

(1) Defendants' Motion for Summary Judgment (Dkt. No. 103) is GRANTED;

(2) Plaintiffs' Motion for Summary Judgment (Dkt. No. 84) is DENIED; and

(3) Intervenor-Plaintiffs' Motion for Summary Judgment (Dkt. No. 94) is DENIED.


SO ORDERED this <u>13th</u> day of June, 2007.


THE HONORABLE JOHN C. COUGHENOUR
UNITED STATES DISTRICT JUDGE